# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MICHIGAN
# SOUTHERN DIVISION

UNITED STATES OF AMERICA,

    Plaintiff,

v.

D-2 VICTOR ATTISHA,

    Defendant.

_____/

Criminal Number 18-20668

Hon. George Caram Steeh

## Government's Amended Response Opposing Defendant's Motion for Compassionate Release

The defendant, Victor Attisha, has served only a few months of a 60-month sentence for his role in a multi-million dollar illegal marijuana business. And this wasn't his first federal conviction: In 2001, Attisha was convicted of selling different contraband—stolen firearms. He has nonetheless filed a motion for his compassionate release. But even if he was eligible, the § 3553(a) factors—especially his record and limited amount of time served on his sentence—do not warrant this relief.

## Background

For years, but at least as early as 2016, Attisha and his co-defendants devised a scheme to produce, sell, and launder the profits

1

from an illegal marijuana business. (PSR, ¶ 8). They grew the marijuana in local operations (or "grows") in the Detroit Metro Area. (*Id.*, ¶ 13). They then used a number of businesses to launder the millions of dollars in proceeds. (*Id.*, ¶¶ 14-16).

A federal grand jury indicted Attisha and his co-defendants for various marijuana trafficking and money laundering offenses in 2018. (*Id.*, ¶ 1). He eventually pleaded guilty to conspiring to distribute marijuana. (*Id.*, ¶ 3). His guidelines were 60-71 months. (*Id.,* ¶ 85).

The parties originally thought his guideline range was lower, but the probation department uncovered additional criminal history points, which increased Attisha's Criminal History Category—from a category II to III. (*Id.*). That criminal history included a 2001 conviction for the sale of stolen firearms. (*Id.*, ¶ 42). In that case, Attisha sold a government cooperator a stolen handgun, and previously offered to sell this person numerous handguns, hand grenades, and a sawed-off shotgun. (*Id.*). That judge sentenced him to 27 months in prison.

After considering this previous case and all of the § 3553(a) factors, this Court sentenced Attisha to 60 months in prison, noting that

Attisha's "significant [criminal] operation" was a crime that "deserves a heavy sentence." (R.55: Tr., PgID 644-45).

Attisha began serving that prison sentence on January 7, 2020. His projected release date is April 9, 2024. Accordingly, he has served less than 10% of his prison term.

Attisha is serving his sentence at FCI Morgantown. Attisha declined the influenza vaccine shortly after arriving there. (January 16, 2020 BOP Vaccine Consent Form, attached as **Exhibit 1**). Despite that dubious health care decision, Attisha proactively manages his weight while incarcerated with step-ups, a low-impact exercise. (March, 2, 2020 BOP Clinical Encounter, attached as **Exhibit 2**; March 30, 2020 BOP Clinical Encounter, attached as **Exhibit 3**; March 5, 2020 Film Results attached as **Exhibit 4** (documenting no fracture in Attisha's left knee, which bothers him after sitting for long periods; diagnosed in other exhibits as a sprain or tendonitis)). Attisha's weight (301.5 lbs to 290.0 lbs) and BMI (47.3 to 45.4) declined between January 15, 2020 and February 12, 2020, which indicates that his obesity is being managed, with positive results. (January 15, 2020 BOP Clinical Encounter, attached as **Exhibit 5**; February 12, 2020 BOP Clinical Encounter,

3

attached as **Exhibit 6**). Attisha was instructed to take prednisone for only twelve (12) days – from March 30, 2020 to April 11, 2020 – to treat his knee (May 11, 2020 BOP Medication Summary, attach as **Exhibit 7**); Attisha's claim that his use of prednisone "places him at high risk for COVID-19" is spurious because (1) the term "prednisone" is not in the article that he cites and (2) he used the prescription for only a very short period. Attisha, at most, has vaguely alleged that sleep apnea is *correlated* with Covid-19. However, a condition that is linked to Covid-19 only by correlation (aka comorbidity), but not by *causation*, is an improper basis to grant compassionate release.[1] Also, like Attisha's controlled obesity, his "[s]leep apnea" is "*controlled with CPAP.*" (January 15, 2020 BOP Clinical Encounter, attached as **Exhibit 5**, p. 2).

---

[1] Similarly, some defendants have improperly cited hypertension as a basis for compassionate release. However, hypertension is linked to Covid-19 only by correlation (aka comorbidity), but not by causation. *See* "Hypertension and COVID-19," American Journal of Hypertension; A statement from the International Society of Hypertension on COVID-19.

## Argument

I. **The Bureau of Prisons has responded to Covid-19 by protecting inmates and increasing home confinement.**

    A. **The Bureau of Prisons' precautions have mitigated the risk from Covid-19 within its facilities.**

The Bureau of Prisons has reacted quickly to confront Covid-19's spread within its facilities. For over almost a decade, the Bureau of Prisons has maintained a detailed protocol for responding to a pandemic. Consistent with that protocol, the Bureau of Prisons began planning for Covid-19 in January 2020.

On March 13, 2020, the Bureau of Prisons began modifying its operations to implement its Covid-19 Action Plan and minimize the risk of Covid-19 transmission into and inside its facilities. *See* BOP Covid-19 Modified Operations Website. Since then, as the worldwide crisis has evolved, the Bureau of Prisons has repeatedly revised its plan. To stop the spread of the disease, the Bureau of Prisons has restricted inmate movement within and between the facilities. *See id.* Only limited group gathering is allowed, and social distancing is maximized. Staff and inmates are also issued face masks to wear in public areas. *See* BOP FAQs: Correcting Myths and Misinformation.

5

Every newly admitted inmate is screened for Covid-19 risk factors and symptoms. Asymptomatic inmates with risk of exposure are placed in quarantine for a minimum of 14 days or until cleared by medical staff. Symptomatic inmates are provided with medical evaluation and treatment and are isolated from other inmates until testing negative for Covid-19 or being cleared by medical staff under the CDC's criteria. In areas with sustained community transmission, all staff are screened for symptoms. Staff registering a temperature of 100.4 degrees Fahrenheit or higher are barred from the facility on that basis alone. A staff member with other symptoms can be placed on leave by a medical officer.

Other access to the facilities has likewise been restricted. Contractors are only permitted access if performing essential services, and any contractor who requires access is screened for symptoms and risk factors. Social and legal visits have been suspended to limit the number of people entering the facility and interacting with inmates. But to ensure that relationships and communication are maintained throughout this disruption, the Bureau of Prisons has increased inmates' telephone allowance to 500 minutes per month. Legal visits

are permitted on a case-by-case basis after the attorney has been
screened for infection.

Like all other institutions, penal and otherwise, the Bureau of
Prisons has not been able to eliminate the risks from Covid-19
completely, despite its best efforts. But the Bureau of Prisons' measures
will help federal inmates remain protected from Covid-19 and ensure
that they receive any required medical care during these difficult times.

**B.     The Bureau of Prisons is increasing the number of
inmates who are granted home confinement.**

The Bureau of Prisons has also responded to Covid-19 by increasing
the placement of federal prisoners in home confinement. New
legislation now temporarily permits the Bureau of Prisons to "lengthen
the maximum amount of time for which [it] is authorized to place a
prisoner in home confinement" during the Covid-19 pandemic.
Coronavirus Aid, Relief, and Economic Security Act (CARES Act)
§ 12003(b)(2), Pub. L. No. 116-136, 134 Stat. 281, 516 (Mar. 27, 2020).
The Attorney General has also issued two directives, ordering the
Bureau of Prisons to use the "various statutory authorities to grant
home confinement for inmates seeking transfer in connection with the
ongoing Covid-19 pandemic." (03-26-2020 Directive to BOP, at 1; *accord*

7

04-03-2020 Directive to BOP, at 1). The directives require the Bureau of
Prisons to identify the inmates most at risk from Covid-19 and "to
consider the totality of circumstances for each individual inmate" in
deciding whether home confinement is appropriate. (03-26-2020
Directive to BOP, at 1).

The Bureau of Prisons' efforts on this point are not hypothetical.
Over 2,549 federal inmates have been granted home confinement since
the Covid-19 pandemic began, and that number continues to grow. BOP
Coronavirus FAQs. As the Attorney General's directives have explained,
these home-confinement decisions have required evaluating several
criteria:

> 1.) Each inmate's age and vulnerability to Covid-19;
>
> 2.) Whether home confinement would increase or decrease
> the inmate's risk of contracting Covid-19; and
>
> 3.) Whether the inmate's release into home confinement
> would risk public safety.

(03-26-2020 Directive to BOP; 04-03-2020 Directive to BOP).

These criteria not only make sense, but also fit the realities of the
Covid-19 pandemic far better than any other solution does. The Bureau
of Prisons cannot open its facilities' gates indiscriminately and unleash
tens of thousands of convicted criminals, en masse. It must focus on the

inmates who have the highest risk factors for Covid-19 and are least likely to engage in new criminal activity. This is true not just to protect the public generally, but to avoid the risk that a released defendant will bring Covid-19 back into the jail or prison system if he violates his terms of release or is caught committing a new crime. *See* 18 U.S.C. § 3624(g)(5); 34 U.S.C. § 60541(g)(2). The Bureau of Prisons' home-confinement initiative thus appropriately focuses on the inmates who will most benefit from release and whose release is least risky.

The Bureau of Prisons must also balance another important consideration: how likely is an inmate to abide by the CDC's social-distancing protocols or other Covid-19-based restrictions on release? Many inmates—particularly those who have been convicted of serious offenses or have a lengthy criminal record—been already proven unwilling to abide by society's most basic norms. It is more than reasonable to evaluate whether a particular inmate would adhere to release conditions, and social-distancing protocols during the pandemic. And if a prisoner would be unlikely to take release conditions or Covid-19 precautions seriously, he would also be far more likely than the general public to contract and spread Covid-19 if released.

9

Finally, the Bureau of Prisons' home-confinement initiative allows it to marshal and prioritize its limited resources for the inmates and circumstances that are most urgent. For any inmate who is a candidate for home confinement, the Bureau of Prisons must first ensure that his proposed home-confinement location is suitable for release, does not place him at an even greater risk of contracting Covid-19, and does not place members of the public at risk from him. It must assess components of the release plan, including whether the inmate will have access to health care and other resources. It must consider myriad other factors, including the limited availability of transportation right now and the probation department's reduced ability to supervise inmates who have been released. All of those decisions require channeling resources to the inmates who are the best candidates for release.

Those types of system-wide resource-allocation decisions are difficult even in normal circumstances. That is why Congress tasked the Bureau of Prisons to make them and has not subjected the decisions to judicial review. 18 U.S.C. § 3621(b) ("Notwithstanding any other provision of law, a designation of a place of imprisonment under this subsection is not reviewable by any court."); *United States v. Patino*, No. 18- 20451,

10

2020 WL 1676766, at *6 (E.D. Mich. Apr. 6, 2020) ("[A]s a general rule, the Court lacks authority to direct the operations of the Bureau of Prisons."). It is especially true now, given the Bureau of Prisons' substantial and ongoing efforts to address the Covid-19 pandemic.

## II.   The Court should deny Attisha's request for compassionate release.

Attisha's request for a reduced sentence should be denied. A district court has "no inherent authority . . . to modify an otherwise valid sentence." *United States v. Washington*, 584 F.3d 693, 700 (6th Cir. 2009). Quite the contrary: a district court's authority to modify a defendant's sentence is "narrowly circumscribed." *United States v. Houston*, 529 F.3d 743, 753 n.2 (6th Cir. 2008). Absent a specific statutory exception, a district court "may not modify a term of imprisonment once it has been imposed." 18 U.S.C. § 3582(c). Those statutory exceptions are narrow. *United States v. Ross*, 245 F.3d 577, 586 (6th Cir. 2001). Compassionate release under 18 U.S.C. § 3582(c)(1)(A) is equally narrow.

*First*, compassionate release requires exhaustion. If a defendant moves for compassionate release, the district court may not act on the motion unless the defendant files it "after" either completing the

11

administrative process within the Bureau of Prisons or waiting 30 days from when the warden at his facility received his request. 18 U.S.C. § 3582(c)(1)(A); *United States v. Raia*, 954 F.3d 594, 595–96 (3d Cir. 2020). Because this requirement is a statutory one and not judicially crafted, it is mandatory. *Ross v. Blake*, 136 S. Ct. 1850, 1856–57 (2016); *Island Creek Coal Co. v. Bryan*, 937 F.3d 738, 751 (6th Cir. 2019).

*Second*, even if a defendant exhausts, he must show "extraordinary and compelling reasons" for compassionate release, § 3582(c)(1)(A), and release must be "consistent with" the Sentencing Commission's policy statements. As with the identical language in § 3582(c)(2), compliance with the policy statements incorporated by § 3582(c)(1)(A) is mandatory. *See Dillon v. United States*, 560 U.S. 817 (2010); *United States v. Jackson*, 751 F.3d 707, 711 (6th Cir. 2014). To qualify, a defendant must have a medical condition, age-related issue, family circumstance, or other reason that satisfies the criteria in USSG § 1B1.13(1)(A) & cmt. n.1, and he must "not [be] a danger to the safety of any other person or to the community," USSG § 1B1.13(2).

*Third*, even if a defendant is eligible for compassionate release, the district court may not grant the motion unless the factors in 18 U.S.C.

12

§ 3553(a) support release. 18 U.S.C. § 3582(c)(1)(A); USSG § 1B1.13. As at sentencing, those factors require the district court to consider the defendant's history and characteristics, the seriousness of the offense, the need to promote respect for the law and provide just punishment for the offense, general and specific deterrence, and the protection of the public. 18 U.S.C. § 3553(a).

### A.    Attisha has exhausted his administrative remedies.

On April 23, 2020, Attisha submitted his administrative request to the BOP. (April 23, 2020 Administrative Request, attached as **Exhibit 8**). On May 5, 2020, Attisha's request was denied. (May 5, 2020 Administrative Denial, attached as **Exhibit 9**). Attisha has exhausted his administrative remedies.

### B.    The Court should deny Attisha's compassionate release request.

Even though Attisha has exhausted his administrative remedies, compassionate release is nonetheless improper. Compassionate release must be "consistent with applicable policy statements issued by the Sentencing Commission." 18 U.S.C. § 3582(c)(1)(A). Congress tasked the Sentencing Commission with "describ[ing] what should be considered extraordinary and compelling reasons for [a] sentence reduction" under

13

§ 3582(c)(1)(A), as well developing "the criteria to be applied and a list of specific examples" for when release is permitted. 28 U.S.C. § 994(t).

Because the Sentencing Commission has fulfilled Congress's directive in USSG § 1B1.13, that policy statement is mandatory. Section 3582(c)(1)(A)'s reliance on the Sentencing Commission's policy statements mirrors the language governing sentence reductions under 18 U.S.C. § 3582(c)(2) for retroactive guideline amendments. *Compare* § 3582(c)(1)(A) *with* § 3582(c)(2). When Congress uses the same language in the same statute, it must be interpreted in the same way. *Marshall*, 954 F.3d at 830. In both contexts, then, the Sentencing Commission's restraints "on a district court's sentence-reduction authority [are] absolute." *United States v. Jackson*, 751 F.3d 707, 711 (6th Cir. 2014); *accord Dillon v. United States*, 560 U.S. 817, 830 (2010).

The First Step Act did not change that. It amended only *who* could move for compassionate release under § 3582(c)(1)(A). It did not amend the substantive requirements for release. *United States v. Saldana*, No. 19-7057, 2020 WL 1486892, at *2–*3 (10th Cir. Mar. 26, 2020); *United States v. Mollica*, No. 2:14-CR-329, 2020 WL 1914956, at *4 (N.D. Ala. Apr. 20, 2020). Section 1B1.13 remains binding.

14

Section 1B1.13 cabins compassionate release to a narrow group of non-dangerous defendants who are most in need. That policy statement limits "extraordinary and compelling reasons" to four categories: (1) the inmate's medical condition; (2) the inmate's age; (3) the inmate's family circumstances; and (4) other reasons "[a]s determined by the Director of the Bureau of Prisons," which the Bureau of Prisons has set forth in Program Statement 5050.50. USSG § 1B1.13 cmt. n.1. As the Tenth Circuit recently explained, a district court "lack[s] jurisdiction" to grant compassionate release when a defendant's circumstances do not fall within those categories. *Saldana*, 2020 WL 1486892, at *3.

The Covid-19 pandemic does not, by itself, qualify as the type of inmate-specific condition permitting compassionate release. The Bureau of Prisons has worked diligently to implement precautionary measures reducing the risk from Covid-19 to Attisha and other inmates. Thus, as the Third Circuit has explained, "the mere existence of Covid-19 in society and the possibility that it may spread to a particular prison alone cannot independently justify compassionate release, especially considering BOP's statutory role, and its extensive and professional efforts to curtail the virus's spread." *Raia*, 954 F.3d at 597.

15

Further, although a defendant's heightened risk from Covid-19 in prison might, in some circumstances, satisfy the medical or age criteria in USSG § 1B1.13 cmt. n.1, Attisha's circumstances cast doubt on whether that is true here. The *average* person may have a higher relative risk of contracting Covid-19 in a certain prison than if released among the public at large. But § 1B1.13 requires an *individualized* assessment, and an individual defendant's relative risk varies widely. *See United States v. Austin*, No. 15-20609, 2020 WL 2507622, at *4–*5 (E.D. Mich. May 15, 2020). It depends on the precautions at his prison, the number of Covid-19 cases there, whether and how much that number might increase or decrease, the prison's medical facilities, the defendant's release plan, the threat from Covid-19 in his release location, his access to medical care if released, and his willingness to abide by release restrictions and social-distancing protocols. *See id.* FCI Morgantown has ***zero (0)*** confirmed inmate or staff Covid-19 cases. And as Attisha's prior conduct shows, he would also be unlikely to follow basic restrictions on release – much less the CDC's social-distancing protocols or a stay-at-home order. So it is hardly clear that Attisha faces a greater risk now than he would if released. *See, e.g., United States v.*

16

*Fry*, 2020 WL 1923218 (D. Minn. Apr. 21, 2020) (denied for 66-year-old

man who is obese and has heart disease and high blood pressure; "To

merit such compassionate release, Fry must show more than a mere

speculation of the possibility of contracting the virus.")

Finally, even if the combination of Attisha's medical conditions and

the Covid-19 pandemic satisfied the initial criteria for eligibility in

USSG § 1B1.13 cmt. n.1, Attisha would remain ineligible for

compassionate release because he is a danger to the community. Section

1B1.13(2) only permits release if a "defendant is not a danger to the

safety of any other person or to the community, as provided in 18 U.S.C.

§ 3142(g)." It thus prohibits the release of dangerous offenders,

including many drug dealers, even without any indication that they

engaged in violence. *See United States v. Stone*, 608 F.3d 939, 947–48 &

n.6 (6th Cir. 2010). It also bars the release of many other defendants.

An evaluation of dangerousness under § 3142(g) requires a

comprehensive view of community safety—"a broader construction than

the mere danger of physical violence." *United States v. Cook*, 880 F.2d

1158, 1161 (10th Cir. 1989) (per curiam). So even many "non-violent"

offenders—such as those who have been involved in serial or significant

17

fraud schemes—may not be released under § 3582(c)(1)(A). USSG

§ 1B1.13(2); *see Stone*, 608 F.3d at 948 n.7.

Adhering to § 1B1.13(2) is especially important given the current

strain on society's first responders and the rise in certain types of crime

during the Covid-19 pandemic. Police departments in many cities have

been stretched to their limits as officers have either contracted Covid-19

or been placed in quarantine. Some cities, including Detroit, have seen

spikes in shootings and murders. Child sex predators have taken

advantage of bored school-aged kids spending more time online. Covid-

19-based fraud schemes have proliferated. There are real risks to public

safety right now, and those risks will only increase if our community is

faced with a sudden influx of convicted defendants.

Because Attisha's release would endanger the community, §

1B1.13(2) prohibits reducing his sentence under § 3582(c)(1)(A).

### C.   The factors in 18 U.S.C. § 3553(a) strongly weigh against compassionate release.

Even when an inmate has shown "extraordinary and compelling

reasons" and demonstrated that he is not dangerous, he is still not

entitled to compassionate release. Before ordering relief, the Court must

consider the factors set forth in 18 U.S.C. § 3553(a) and determine that

release is still appropriate. *See United States v. Austin*, No. 15-20609, 2020 WL 2507622, at *3–*5 (E.D. Mich. May 15, 2020) (holding that the "[d]efendant's circumstances do not warrant compassionate release . . . under 18 U.S.C. § 3553(a)"); *United States v. Murphy*, No. 15-20411, 2020 WL 2507619, at *6 (E.D. Mich. May 15, 2020) (denying compassionate release because "the 18 U.S.C. § 3553(a) sentencing factors do not favor release"); *see also United States v. Kincaid*, 802 F. App'x 187, 188–89 (6th Cir. 2020) (upholding a district court's denial of compassionate release based on the § 3553(a) factors). So even if the Court were to find Attisha eligible for compassionate release, the § 3553(a) factors should still disqualify him.

Attisha already served a 27-month prison sentence for selling contraband. But that did not deter him from participating in a multi-million dollar marijuana trafficking business. So this Court noted, when fashioning its original sentence, that Attisha needed to be deterred "given the prior violations . . . ." (R.55: Tr., 646). And Attisha has only served a few months on that sentence—less than 10% of the original sentence this Court imposed. *See United States v. Kincaid*, No. 19-6271, 2020 WL 2521303, at *1 (6th Cir. May 18, 2020) (noting that it was not

19

even "a close question" that a district court properly denied compassionate release on the basis that the defendant "had served only a fraction of her sentence," there roughly 15%). In other words, drastically reducing Attisha's sentence would not deter him from future criminal behavior.

The "nature and circumstances of the offense" (§ 3553(a)(1)) is a "very serious" (PSR, ¶ 105) conspiracy that generated millions of dollars, in the black market, distributing hundreds of pounds of an illegal drug that leads to community decay (PSR, ¶ 107), can be deadly in concentrated forms (edibles, etc.), and invites violence at dispensaries.

In addition, a sentence of just a few months would not appropriately consider the serious crime here. As this Court observed during the initial sentencing hearing, Attisha was involved in a "significant operation" that "deserves a heavy sentence." (R.55: Tr., 644-45).

## III. If the Court were to grant Attisha's request, it should order a 14-day quarantine before release.

If the Court were inclined to grant Attisha's request despite the government's arguments above, the Court should order that he be subjected to a 14-day quarantine before release.

20

## Conclusion

Attisha's request should be denied.

Respectfully submitted,

MATTHEW SCHNEIDER
United States Attorney

J. MICHAEL BUCKLEY
Assistant United States Attorney

*/s/Paul A. Kuebler*

PAUL A. KUEBLER (NY 4268561)
Assistant United States Attorney
211 West Fort Street, Suite 2001
Detroit, Michigan 48226
(313) 226-9641
Dated: May 22, 2020       paul.kuebler@usdoj.gov

21

## <u>Certificate of Service</u>

I certify that on May 22, 2020, I electronically filed the foregoing using with the Clerk of the Court of the Eastern District of Michigan using the ECF system, and a copy will be generated by the ECF system and sent to the Attorney(s) of Record.

*/s/Paul A. Kuebler*
PAUL A. KUEBLER (NY 4268561)
Assistant United States Attorney
211 West Fort Street, Suite 2001
Detroit, Michigan 48226
(313) 226-9641
paul.kuebler@usdoj.gov
